Paul W. Conable, OSB #975368, *pro hac vice admission to be sought*
  paul.conable@tonkon.com
Michael C. Willes, SBN 273145
  michael.willes@tonkon.com
TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, OR 97204-2099
Phone: 503.221.1440
Fax: 503.274.8779

Attorneys for Apex Directional Drilling, LLC

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| APEX DIRECTIONAL DRILLING, LLC, an Oregon limited liability company authorized to do business in the State of California,<br><br>Plaintiff,<br><br>v.<br><br>SHN CONSULTING ENGINEERS & GEOLOGISTS, INC., a California corporation,<br><br>Defendant. | Case No. 15-cv-02501<br><br>**COMPLAINT FOR BREACH OF PROFESSIONAL DUTY, NEGLIGENT MISREPRESENTATION, AND TORT OF ANOTHER**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Apex Directional Drilling, LLC alleges as follows:

## **THE PARTIES**

1.      Plaintiff Apex Directional Drilling, LLC is, and at all times herein mentioned was, an Oregon limited liability company with its principal place of business at 8850 SE 76th Drive, Portland, Oregon, duly authorized to engage in business in the State of California.

2.      Defendant SHN Consulting Engineers & Geologists, Inc. is, and at all times herein mentioned was, a California corporation with its principal place of business at 812 West Wabash Avenue, Eureka, California.

Page 1 - COMPLAINT

## JURISDICTION

3.      This is an action between citizens of different states.  The amount in controversy, exclusive of costs, exceeds $75,000.  Therefore, this Court has jurisdiction of this action under 28 U.S.C. § 1332.

## VENUE

4.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because the events giving rise to Plaintiff's claims occurred in Humboldt County.

## INTRADISTRICT ASSIGNMENT

5.      Civil L.R. 3-2(c) and (f) provide the basis for assignment of this action because the events giving rise to Plaintiff's claims occurred in Humboldt County.

## STATEMENT OF FACTS AND CLAIMS

**The City of Eureka's Sewer Project**

6.      Plaintiff is a leader in the business of horizontal directional drilling ("HDD"). HDD is a steerable underground boring system for the installation of pipes, conduit, or cable in a shallow arc using a surface-based drilling rig.  It is a cost-effective and environmentally preferable alternative to surface trenching.  Plaintiff is an expert in HDD and one of the leading HDD contractors in the nation.

7.      The City of Eureka, California (the "City") undertook a multimillion dollar public works project to improve a major wastewater pipeline connection for treatment of its municipal sewage.  Because of its scale and years-long construction period, the City's sewer improvement project was divided into discrete sections, each requiring an individual bidding process.  The part of the project at issue here is known as the Martin Slough Force Main Drill Project, Bid No. 2013-26 (the "Project").

8.      The Project called for the use of HDD to bore a forty-two-inch diameter tunnel for installation of a high-density polyethylene ("HDPE") sewer pipe, twenty-six inches in diameter, over 4000 feet in length.  The pipe would ultimately extend in a general east-west direction through un upland area called Pine Hill, connecting the Martin Slough sewer project on the east

Page 2 -  COMPLAINT

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1  side of Pine Hill to its west side, from where it would run under Highway 101 and into the City's

2  sewage treatment plant.  In places, the bore path/tunnel is more than 145 feet below the surface.

3       9.     The City hired Defendant to use its purported "regional" expertise in "water and

4  wastewater system design" to prepare geological studies of the Project site and the surrounding

5  areas and to draft the Project plans.

6  **The Geotechnical Baseline Report**

7       10.     On or about April 19, 2013, the City requested bids from contractors who were

8  interested in performing work on the Project.  As part of informing potential bidders about the

9  Project, the City presented information about its scope, design specifications, and anticipated soil

10  conditions.  This information was the fundamental basis and the key representation upon which

11  potential bidders, including Plaintiff, relied.

12       11.     Specifically, the City disseminated to Plaintiff and other potential bidders

13  technical drawings depicting the proposed bore profile, geographic features, and certain technical

14  details of the HDD work to be performed on the Project, such as the angle that the bore should

15  take and the manner of preparing entry and exit points.  Defendant prepared these technical

16  drawings.  They bear Defendant's logo as well as the signed approval of Defendant's

17  representative, Brian Freeman.

18       12.     The City also disseminated to Plaintiff and other potential bidders contract

19  documents (the "Contract"), which included bidding procedures, a form of contract to be entered

20  into with the City, general and special provisions for conducting the HDD work on the Project,

21  and a document entitled "Geotechnical Baseline Report" ("the GBR").  A true and correct copy

22  of the final, executed Contract, including the GBR, is attached to this Complaint as Exhibit A

23  and is made a part hereof by reference.

24       13.     The GBR states, in part, that it

25            is an informational document that is intended to be part of the
          construction bid package, where it will establish baseline

26            conditions.  The primary purpose providing baseline conditions
          information is to reduce uncertainty about geotechnical conditions

27            to the extent possible, promote competitive bidding, and establish a
          clear basis for resolving differing site conditions.

28

Page 3 - COMPLAINT

. . . .

> The intent of the baseline information presented herein is to provide Contractors with a clear explanation of the geologic and geotechnical conditions relative to the proposed project, so that key geotechnical constraints and requirements that must be addressed by the Contractor during bid preparation and construction are well-defined.

Ex. A at 132.

14.     Again, the Contract bears Defendant's logo as well as the signed approval of Defendant's representative, Freeman.  Based on these and other representations, Plaintiff alleges that Defendant prepared the technical drawings and the Contract, including the GBR.  In preparing the Contract, including the GBR, Defendant knew and intended that bidders, such as Plaintiff, would rely on its contents when evaluating whether to bid on the Project and how to estimate the necessary inputs for completing the work under the conditions presented.

15.     During the bidding and work stages, the City was represented by Defendant, which served as lead engineer on the Project.  Defendant represented that it had provided engineering and geological services on numerous public-works projects in and around the area of the City that involved subsurface drilling or excavation.  The geologist on the Project was Roland Johnson, an employee of Defendant at the time.  Johnson represented to Plaintiff during the pre-bid period that he had "decades" of experience studying and working in the geological conditions in and around the Project site.

16.     One critical factor in HDD work generally is the subsurface conditions in which the drilling will occur.  In order for HDD to be feasible for a project of this scope, the soil must be "competent" and "stable."  These are soils that are not prone to further settlement or collapse.  Wet, sandy or muddy conditions are neither competent nor stable.  If the subsurface conditions do not feature competent and stable soil, a project of this scope will be challenging and risky, or perhaps even impossible.

17.     Soil competency and stability were especially important in this Project for three reasons:  (1) the length of the bore, (2) the appropriate equipment to perform the HDD work, and (3) the complexity of the designed bore profile.

Page 4 - COMPLAINT

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

18.     First, the nearly mile-long bore was unusually long for projects which incorporate pipe made from HDPE, rather than steel.  HDPE, a form of plastic, is not as strong as steel and is therefore more vulnerable to failure during the process of pulling the pipe back through the bore hole where soil conditions have compromised the integrity of the tunnel walls.  The HDPE pipe is akin to a large plastic hose, and if the tunnel walls have collapsed, the HDPE may simply break apart when stressed by soil resistance in the pullback process.

19.     Second, due to the length, diameter, and weight of the nearly mile-long HDPE pipe, large, heavy and very powerful HDD equipment is used.  This equipment includes a large 500,000-pound capacity drill rig; a drill stem (each of the over 140 thirty-foot segments required for this Project weighs nearly 900 pounds); tooling, consisting of a drill "bit," motor to run the drill bit, steering system tools, and housing (these tooling components weigh up to 8000 pounds); and the reamers used to expand the bore hole once the initial bore is completed (these weigh up to 3500 pounds each).  It was imperative that Plaintiff receive accurate soil information so that it could assure that Defendant, as Project engineer, would approve use of the appropriate techniques and materials for the conditions.

20.     Third, the shape of the bore as designed had a significant curve plus vertical contour up and down, making it very complicated.  In order to control an underground drill and steer it around a curve, it is essential that the soil formation be stable and dense enough to provide resistance to the drill tooling to provide for good steering response.  Because of the limited layout provided for the Project at the bore exit point, it was critical to adhere to the bore profile, which in turn required stable and competent soils to permit accurate steering.

21.     In the GBR, Defendant informed bidders, including Plaintiff, that for the majority of the length of the Project, the soils in which the work would be performed would be stable and competent "Hookton formation" soils.  The GBR characterized the Hookton formation soils as stable and well-suited to HDD work.  This was critical to Plaintiff because HDD operations for this job require "competent" soil, such as are found in the Hookton formation, meaning soil that has sufficient stability and density to enable the drilling equipment to be controlled and steered, and for the resulting bore hole to remain intact and not collapse.  The

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

GBR and its authoritative description of the soil formation through which the HDD work would be performed was a material inducement to Plaintiff's decision to bid on the Project.  Plaintiff would not have bid on the Project if it had known the true soil conditions.

22.     The GBR also contained results and data from only a single relevant test bore hole which, according to Defendant, showed "hard drilling" and "high blow" counts, critical information that indicates stable soil conditions.  The GBR directed contractors' attention to the evidence of subsurface conditions indicated by this bore.  In fact, this single bore sample, referred to as the Meyers-1 bore, was actually located a significant distance from the actual HDD bore path and reached a depth of only 121.5 feet.

23.     An engineer using the same skill, prudence, and diligence as other members of the engineering profession commonly possess and exercise would not rely on such limited data to design and carry out the HDD work on the Project.

24.     On or about May 6, 2013, Defendant and the City held a mandatory pre-bid meeting for all prospective bidders at Defendant's offices.  Plaintiff attended this meeting.  There Representatives of Defendant and the City reviewed various portions of the Contract and fielded questions about the Project.  To confirm that the GBR accurately reflected actual Project soil conditions, Plaintiff asked Defendant if soils in the Project path were competent and stable.  Defendant assured Plaintiff that the Project soils were stable and competent Hookton formation soils.

25.     During or immediately following the pre-bid meeting, Johnson in fact identified for Plaintiff's employees, including Sean Hogan, senior director of HDD operations and technical support, precisely where the stable and competent Hookton formation soil was on a profile-view diagram of the Project area.  A true and correct copy of this diagram is attached to this Complaint as Exhibit B and is made a part hereof by reference.  Johnson's representations corroborated Defendant's other representations that for the majority of the length of the Project, the soils in which the work would be performed would be stable and competent soils.

26.     Also on the day of the mandatory pre-bid meeting, Defendant invited prospective bidders to participate in a guided "field walk" of the Project site.  Plaintiff's representatives

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1  accepted this invitation.  Defendant's representative spent considerable time walking the length

2  of the surface above the prescribed Project bore profile and informing prospective bidders about

3  the soil composition.  Consistent with the GBR's instruction that bidders should rely on "surface

4  conditions observed during site visits as the basis for bids," Defendant's representative identified

5  Hookton formation soils exposed at ridges and other outcroppings to evidence that stable and

6  competent drilling conditions would be found throughout the majority of the designed bore.  The

7  soils exhibited to plaintiff would have provided good conditions for the HDD work.

8        27.     Plaintiff reasonably relied on Defendant's representations in the GBR, including

9  the promise that a contract adjustment was available in the event of differing soil conditions, and

10  on Johnson's assurances of stable and competent Hookton formation, in deciding to bid on the

11  Project.

12  **The Contract Is Awarded to Plaintiff and Work Commences**

13        28.     On or about May 24, 2013, Plaintiff submitted its bid for $3,658,332.30.

14        29.     Plaintiff was the lowest qualified bidder, and effective on or about July 24, 2013,

15  the City and Plaintiff executed the Contract.

16        30.     Defendant was the engineer on the Project, meaning that it had supervisory

17  responsibility over the design, preparation, and execution of work to be performed under the

18  Contract.

19        31.     By letter dated July 24, 2013, the City gave Plaintiff notice to proceed under the

20  Contract, directing Plaintiff to commence work on the Project.  Thereafter, Plaintiff in all

21  respects attempted to comply with the conditions and provisions of the Contract and began HDD

22  operations on the east side of the Pine Hill uplands, heading generally in a westerly direction, all

23  as directed in the Project specifications provided by Defendant and the City and as supervised

24  and directed by Defendant.  Defendant's representatives were on the construction site daily and

25  directed and approved each and every step of Plaintiff's efforts on the Project.

26  **Plaintiff Encounters Unstable Soil Conditions from the Outset**

27        32.     In the original Project work plan, the City's bore path design called for an initial

28  drilling angle of 1.4 degrees.  For many reasons, this plan was not feasible.  First, the design

Page 7 - COMPLAINT

1  would require use of outdated and obsolete drilling technology. Modern drill rigs are not

2  designed to initiate a 1.4 degree angle, which is too slight for successful drilling techniques.

3  Second, the design specified placement of the drill rig in a submerged position below the ground

4  water level in an area that often flooded, creating concerns about both water damage to the

5  expensive drilling equipment and environmental contamination. Third, the original design did

6  not provide for enough "cover," as it was too shallow and was highly likely to result in hydraulic

7  fractures which could leak drilling fluids into the environmentally sensitive wetlands area.

8        33.     Because Defendant's bore path design was not feasible, Plaintiff proposed a more

9  realistic, steeper drilling path at a seven-degree angle, along with an entry point repositioned

10  forward by approximately 100 feet. The redesigned, steeper entry angle would, assuming the

11  representations made by Defendant in the GBR were accurate, logically get the bore into the

12  stable, competent Hookton soils sooner. The City and Defendant approved this design revision

13  and all associated submittals.

14        34.     Based on Defendant's GBR, Plaintiff expected to begin drilling the bore in a

15  shallow, near-surface layer of marine estuarine deposits, which are wet, organic materials (bay

16  mud), in which steering the drill is impossible. The original Project plans called for driving steel

17  casing from the bore entrance, at the original design angle of 1.4 degrees, for a distance of

18  approximately 285 feet. The steel casing protects the drill rig and allows drilling in unstable soil

19  by providing a hard barrier around the bore path to prevent the tunnel walls from collapsing.

20  According to Defendant and the GBR, after proceeding for approximately 285 feet at an angle of

21  1.4 degrees, the bore would be in stable and competent soils, and therefore no further casing

22  would be required. With the revised drilling angle of seven degrees, along with repositioning the

23  entry point forward approximately 100 feet, the bore would achieve greater depth sooner, and, if

24  Defendant was correct, would be in the predicted stable and competent soils even sooner, thus

25  allowing the casing to be shorter.

26        35.     On or about September 16, 2013, initial casing installation work commenced.

27  Plaintiff discovered that the extent of the surface marine estuarine layer of wet, organic material

28  (bay mud) went far deeper than was predicted by the definitive data set forth in the GBR and

Page 8 - COMPLAINT

1  Johnson.  As work progressed over several days, it became clear to everyone that the Project

2  bore profile was not in stable, competent Hookton formation soils at all.  In fact, contrary to

3  Defendant's representations, Plaintiff found that it was drilling in bay mud and then in flowing

4  sands that held significant amounts of water.

5  **Defendant Directs Plaintiff to Continue Casing Installation**

6      36.     After installing approximately 200 feet of casing at the bore entrance, Plaintiff

7  was still encountering unsuitable soil conditions that were not competent or stable and had still

8  not hit the stable and competent Hookton soils described in the GBR and repeatedly promised by

9  Defendant and Johnson.

10     37.     Defendant, with complete awareness of the physical evidence reflecting the non-

11 conforming soil conditions, directed Plaintiff to drive the casing even further and deeper, in the

12 stated hope that the operation would soon encounter stable and competent Hookton formation

13 soils.

14     38.     On or about October 8, 2013, and after driving approximately 259 feet of casing,

15 Plaintiff informed Defendant that if the casing went any deeper, Plaintiff would not be able to

16 follow the bore path specified in the Project design.  Johnson maintained a daily log while he

17 worked on the Project.  His October 8, 2013 entry hypothesizes that, despite physical evidence

18 retrieved from auger retrievals, "if theoretically correct the casing is well past the contact."  (The

19 point at which casing intersects with stable and competent soil is called the contact, and the

20 actual process of intersecting with the contact is known as meeting refusal.)  Defendant told

21 Plaintiff to proceed.

22     39.     Johnson's October 9, 2013 daily log entry states that "small bits of 'ordinary'

23 (8-15%[]) Hookton were on auger bit."  His notes from that date also recognize the "very high"

24 risks of drilling in the saturated sandy soils that the casing installation ejected to the surface.

25     40.     On or about October 10, 2013, and after approximately 280 feet of casing had

26 been installed, Plaintiff had still not hit the stable and competent Hookton soils promised in the

27 GBR and by Defendant, despite driving casing deeper than the original design, per Defendant's

28 instructions.  Nevertheless, Defendant, the Project engineer, directed Plaintiff to stop installing

Page 9 -  COMPLAINT

1    the casing and claimed that the bore had reached the anticipated stable and competent Hookton

2    soils.  Johnson's daily log entry for October 10, 2013, states that "clearly competent Hookton" is

3    present.  Defendant gave this direction with full knowledge that the soil conditions Plaintiff was

4    still encountering did not match the conditions specified in the GBR.  Plaintiff followed the

5    directions of Defendant, as required by the Contract documents, which vest final authority in the

6    Project engineer as to the acceptability of "work performed" and "as to the manner of

7    performance" of the work.

8          41.    At a meeting held on or about October 11, 2013, Plaintiff and Defendant

9    discussed the transition from casing installation to drilling directly in the soil, known as "pilot

10   boring," should take place.  Plaintiff continued to express concerns that the casing had not

11   actually met stable competent soil (also called "refusal").  Defendant's employee, William

12   McGoldrick, captured in his notes how Johnson overruled Plaintiff's requests for additional time

13   to analyze the feasibility of pilot boring, because in Johnson's opinion the "casing is well placed

14   into Hookton formation" and "there does not appear to be justification for driving more casing."

15   **Plaintiff Continues to Encounter Unstable Soils While Drilling Pilot Bore**

16         42.    Plaintiff accepted Defendant's instructions, converting the casing operations to

17   HDD drilling equipment so the pilot bore could begin.  But when Plaintiff pushed the drill

18   tooling beyond the protective casing, it simply sank into the unstable, flowing sand.

19         43.    Johnson's statements that the casing was in Hookton soils were wrong.  To

20   compensate, Defendant ordered Plaintiff to pump grout and other material into the bore hole in

21   order to provide a stable material through which the drill could pass without sinking deeper into

22   the flowing sand.  Ordering and approving of this course of action was an acknowledgement of

23   the non-competent soils that Plaintiff was encountering.  However, when the City and Defendant

24   were presented with a change order for this additional work caused by the differing soil

25   conditions, the change order was denied based on Defendant's recommendation.

26         44.    The grout provided a stable medium for only a short distance, and Plaintiff's bore

27   went deeper than anticipated as the drill tooling again sank into the loose, wet soil.  This

28

Page 10 - COMPLAINT

1    deviation required a revised bore path.  The City and Defendant were aware of these revisions

2    and approved them before Plaintiff continued with its boring operations.

3         45.    Plaintiff promptly and repeatedly informed the City and Defendant that the

4    conditions onsite were not as had been represented.  Plaintiff also directed Defendant to inspect

5    materials discharged to the surface as the pilot bore advanced.  Soil conditions were also

6    recorded in the Project's daily drilling logs, which plainly showed that the material encountered

7    in the bore was flowing sand, not stable, competent Hookton soils.  The non-conforming soil

8    conditions were also independently confirmed and documented in soil analysis reports that were

9    performed several times per day by independent third parties.  Defendant was provided these

10   analyses daily, as required by the Contract.  Additionally, these conditions were discussed

11   repeatedly, on at least a daily basis, with Defendant's employees, including McGoldrick and

12   Johnson, as the flowing sands encountered were making it nearly impossible to steer the drill

13   steel within the intended bore path.  (Plaintiff would provide formal written notice of the

14   differing site conditions on January 16, 2014 as a matter of formality, but the City and Defendant

15   had been repeatedly made aware of the actual site conditions being encountered from the very

16   beginning of HDD operations, including in numerous other written communications, meetings

17   and construction site visits.)

18        46.    Defendant was apprised of and observed the non-conforming soil conditions on a

19   continual basis at the Project site.  It was also provided with, and had access to, daily logs

20   maintained by Plaintiff's HDD operators and other personnel, including the independent fluids

21   engineers, the independent steering and control engineers, and the drill rig operators, which

22   contemporaneously detailed the conditions Plaintiff was encountering.

23        47.    The non-conforming soil conditions also caused Plaintiff other significant and

24   expensive problems in attempting to follow the daily directions of Defendant's engineers.

25   Among other things, Plaintiff encountered excessive volumes of groundwater, far more than

26   anticipated by the Contract.  Management of excess groundwater increased actual Project costs.

27   It also created muddy conditions and standing water in the entry pit, further increasing costs; but

28

Page 11 - COMPLAINT

1    the City, relying on Defendant's analysis and recommendation, denied Plaintiff's claims for

2    reimbursement for those costs.

3          48.     As Plaintiff continued drilling the pilot bore, the flowing underground sand

4    caused the initial conventional drill tooling to break off from the drill stem and become lost.  Not

5    only did Plaintiff have to replace expensive drill components, it also incurred the substantial cost

6    of obtaining this equipment on an emergency basis.  Because the unstable soil made it impossible

7    for Plaintiff to steer the bore along the original bore profile with conventional tooling, Plaintiff,

8    at the direction of Defendant, tried different and lighter tooling on multiple occasions to address

9    the unexpected soil conditions.

10         49.     Plaintiff attempted various alternative techniques at Defendant's direction to

11   address the non-conforming soil conditions and excess groundwater, such as pumping grout at

12   the termination of the initial casing and changing bentonite solutions in drilling fluids to create

13   greater hole stability, but the City subsequently rejected a change order to authorize the

14   additional costs incurred.  The City also eventually rejected Plaintiff's billing for the excess

15   groundwater, even though the Contract provided a line item specifically for these additional

16   costs.  As the Project engineer, Defendant performed the analyses and made the

17   recommendations City relied upon to reject Plaintiff's requests.  Against all evidence and

18   continued warnings to the contrary, Defendant continued to falsely insist that the drill path was

19   in stable, competent soils.

20         50.     On or about January 11, 2014, as the drill steel neared the western end of the

21   Project, Plaintiff called an onsite meeting attended by representatives of Plaintiff, the City, and

22   Defendant, including Johnson and McGoldrick.  There, Plaintiff's senior director of HDD

23   operations and technical support, Hogan, explained that the unstable soil conditions would not

24   allow the drill steel to achieve the necessary exit trajectory.  Hogan said that, according to

25   Plaintiff's calculations, the actual exit point would be approximately 100 feet west of the planned

26   location.  Defendant and the City instructed Plaintiff to continue drilling.

27         51.     On or about January 13, 2014, Plaintiff in fact concluded the pilot bore where

28   Hogan had predicted.  At a meeting held that day, attended by representatives from the City and

Page 12 - COMPLAINT

1   Defendant, Plaintiff explained that the unstable soil conditions threatened the pilot bore's

2   structural integrity and Plaintiff's ability to complete the Project.

3        52.     From January 13, 2014 until March 25, 2014 or thereabouts, Plaintiff negotiated

4   with the City to obtain necessary change orders and easements so that Plaintiff could ream out

5   the pilot bore and install the HDPE pipe.  Had soil conditions been as Defendant had repeatedly

6   represented, Plaintiff and the City would not have needed to engage in these negotiations and

7   their associated delays.

8        53.     Despite Plaintiff's efforts to propose alternative plans for completing the Project,

9   these negotiations failed to produce a solution the City would agree to.  Effective March 25,

10  2014, the City terminated Plaintiff from the Project.

11  **Defendant Refuses to Apply Differing Soil Conditions Criteria**

12       54.     Even after the true soil conditions were unquestionably known, Defendant falsely

13  claimed that the HDD bore was in the stable and competent Hookton formation.  This was

14  objectively and demonstrably false, but, based on Defendant's analysis and recommendations,

15  the City refused to adjust Plaintiff's compensation per the Contract's procedures for a

16  determination of "differing site conditions."

17       55.     Plaintiff incurred significant equipment, materials, and labor expenses without

18  reimbursement or compensation due to the City's refusal.

19  **Contract-Related Litigation**

20       56.     Plaintiff filed suit against the City in California state court on May 23, 2014,

21  alleging breach of contract for construction of a public work, breach of the duty of good faith and

22  fair dealing, breach of warranty, and fraudulent concealment.  The City moved to compel

23  arbitration, based on the Contract between Plaintiff and the City (to which Defendant is not a

24  party).  The case between the City and Plaintiff is now in arbitration.

25  **FIRST CLAIM FOR RELIEF**

26  **(Breach of Professional Duty)**

27       57.     Plaintiff hereby incorporates each and every allegation of paragraphs 1 through 56

28  above.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

58.     As the engineer on the Project, Defendant owed a duty to Plaintiff to use such skill, prudence, and diligence as other members of the engineering profession commonly possess and exercise.  In preparing the GBR and advising Plaintiffs on their work on the Project, Defendant knew that Plaintiff was relying on and depending on Defendant's expertise and advice.

59.     Defendant breached that duty to Plaintiff by:

- negligently preparing the GBR and technical drawings;
- advising Plaintiff that for the majority of the length of the Project, the soils in which the work would be performed would be stable and competent soils, when in fact they were not;
- relying on inadequate data to design and advise on the Project;
- refusing to acknowledge, despite all the evidence to the contrary, that the subsurface conditions were not competent and stable Hookton formation;
- ordering Plaintiff to stop installing the casing and to transition to pilot boring despite the clear evidence that the soil conditions were not stable; and
- advising the City to deny Plaintiff's requested change orders.

60.     As a reasonably foreseeable result of the breaches alleged above, Plaintiff has sustained damages in an amount to be proven at trial, but not less than $2,100,000.

## SECOND CLAIM FOR RELIEF

### (Negligent Misrepresentation)

61.     Plaintiff incorporates the allegations of paragraphs 1 through 60 above.

62.     Defendant informed Plaintiff that, for the majority of the length of the Project, the work would be performed in stable and competent Hookton formation soils.

63.     After Plaintiff was awarded the Contract and began working on the Project, Defendant maintained that the soil conditions were as it had represented, despite mounting evidence to the contrary.

64.     Defendant was without reasonable grounds for believing its representations in the GBR and on the Project site to be true.  Defendant's GBR was primarily based on a single bore

Page 14 - COMPLAINT

1  hole, the Meyers-1 bore, which was located a significant distance from the actual HDD bore

2  path. Because Defendant had insufficient data from the Project site, it could not reasonably

3  know the actual soil conditions that would be present there. Moreover, Defendant should have

4  known or had reason to believe that Plaintiff would encounter unstable soil conditions based

5  previous work Defendant had performed in the vicinity of the Project site.

6  65. Defendant, acting through its agents, represented that it had years of local project

7  experience and repeatedly assured Plaintiff that based on its analysis and extensive experience

8  that the Project soils were stable and competent Hookton formation soils. Plaintiff reasonably

9  relied on Defendant's representations in the GBR and assurances of stable and competent

10  Hookton formation conditions in deciding to bid on and continue to work on the Project, because

11  Defendant was the Project engineer and employed the Project geologist.

12  66. Due to Defendant's negligent misrepresentation, Plaintiff has sustained damages

13  in an amount to be proven at trial, but not less than $2,100,000.

14  **THIRD CLAIM FOR RELIEF**

15  **(Tort of Another)**

16  67. Plaintiff hereby incorporates each and every allegation of paragraphs 1 through 66

17  above.

18  68. Plaintiff is involved in arbitration against the City arising out of alleged breach of

19  the Contract.

20  69. Defendant induced Plaintiff to bid, work, and continuing working on the Project

21  by misrepresenting the soil conditions in and around the Project site and providing negligent

22  instruction to Plaintiff.

23  70. But for Defendant's breach of professional duty and negligent misrepresentation,

24  Plaintiff would not have been required to act in the protection of its interests by bringing an

25  action against the City or defending against the City's claims.

26  71. Plaintiff has suffered loss of time, attorney fees, and other expenditures totaling

27  an amount to be proven, because of Defendant's breach of professional duty and negligent

28  misrepresentation.

Page 15 - COMPLAINT

1

### **DEMAND FOR JURY TRIAL**

2     72.     Pursuant to Fed. R. Civ. P. 38, Plaintiff demands a trial by jury of all issues raised

3 in this Complaint.

4

### **PRAYER FOR RELIEF**

5     WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

6     1.     Judgment against Defendant in an amount to be determined at trial, but not less

7 than $2,100,000, plus prejudgment interest;

8     2.     Plaintiff's costs and fees incurred herein;

9     3.     Reasonable attorney fees under the common law claim of tort of another; and

10     4.     Such other relief as the Court deems just and equitable.

11     DATED:  June 5, 2015.

12

13         By:    */s/ Michael Willes*

            Paul W. Conable, OSB #975368

14             Michael C. Willes, SBN 273145

15             Attorneys for Apex Directional Drilling, LLC

035940/00014/6455533v5

16

17

18

19

20

21

22

23

24

25

26

27

28

Page 16 - COMPLAINT