UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| APEX DIRECTIONAL DRILLING, LLC, <br><br>  Plaintiff, <br><br>  v. <br><br> SHN CONSULTING ENGINEERS & GEOLOGISTS, INC., <br><br>  Defendant. | Case No. 15-cv-02501-RS <br><br> **ORDER DENYING MOTION TO DISMISS** |

## I.   BACKGROUND[1]

This litigation emanates from problems associated with a municipal sewage construction project. In April of 2013, the City of Eureka, California publicly solicited bids from contractors for the installation of a new wastewater pipeline by use of a technique known as horizontal directional drilling ("HDD").[2] SHN Consulting Engineers & Geologists, Inc. ("SHN") contracted separately with Eureka to serve as lead engineer and project manager. Part of SHN's job was to conduct geological studies of the site and, based on its findings, to prepare plans, reports, and specifications describing the project. Certain of SHN's descriptions of the project, including a Geotechnical Baseline Report ("GBR"), were furnished to potential bidders. Eureka and SHN intended that contractors would rely on the reports and drawings to estimate the necessary inputs for completing the work under the represented conditions and to determine whether and how much

---

[1] This factual background is based on the averments in the complaint, which must be accepted as true at the 12(b)(6) stage.

[2] In fact, the 2013 project at issue here was merely one phase of a years-long endeavor to improve a major wastewater pipeline connection in Eureka. The "project" discussed throughout this order was the Martin Slough Force Main Drill Project, Bid No. 2013-26.

1    to bid for the project. In meetings with prospective bidders, SHN representatives orally affirmed
2    that the findings of the GBR and other materials were accurate.
3        The GBR indicated that the majority of the subterranean region targeted by the project was
4    composed of stable soils suitable for HDD. This representation was critical to contractors. To be
5    successful, HDD jobs require certain soil characteristics. If the soil lacks sufficient stability and
6    density, drilling equipment cannot be effectively controlled and the bore hole is vulnerable to
7    collapse. The GBR's findings were based on a single test bore, which was drilled a significant
8    distance from the planned path of the project.
9        Relying on SHN's representations regarding conditions at the project site, Apex
10   Directional Drilling, LLC ("Apex"), a leading HDD contractor, submitted the lowest qualifying
11   bid (approximately $3.6 million) and entered into a contract with Eureka. Almost immediately
12   after beginning work, Apex encountered adverse conditions. Instead of the competent soils
13   described in the GBR, Apex found itself drilling first in mud and then in flowing sands. While the
14   GBR had anticipated that wet near-surface soils would be initially present during the casing phase
15   of the project, it soon became clear that difficult conditions ran much deeper and farther than
16   anticipated. Over the ensuing months, in reliance on the assurances of SHN representatives
17   present at the project site each day, Apex continued drilling but did not reach the stable soil
18   formations described in the GBR. Following SHN's orders, Apex struggled on with the project, in
19   the process incurring unforeseen expenses and losing valuable equipment to the flowing sands.
20       Even after the true subterranean conditions became known, Apex alleges, SHN
21   unreasonably continued to maintain that the project was proceeding in the competent soils
22   described in the GBR and, on that premise, repeatedly gave Apex illogical instructions. Over the
23   first months of 2014, Apex asked Eureka to authorize change orders reimbursing it for cost
24   overruns, along with easements necessary to complete the project. Based on SHN's
25   recommendations, Eureka rejected those requests and, on March 25, 2014, terminated Apex from
26   the project. Apex quickly sued Eureka in California state court for breach of contract. That case
27   is now in compelled arbitration. SHN was not a party to the contract between Apex and Eureka

and is not a party in the arbitration.

More than a year later, Apex sued SHN in this court, invoking diversity jurisdiction. It asserts three claims for relief under California law: (1) breach of professional duty; (2) negligent misrepresentation; and (3) tort of another. SHN now moves to dismiss the complaint for failure to state a claim. SHN first contends that Apex has no cognizable tort claims against it because an engineer does not owe a contractor any non-contractual duty of care. In fact, a faithful application of the relevant California authorities compels the conclusion that, based on the allegations in the complaint, SHN did owe Apex a duty of care. SHN next argues that the negligent misrepresentation claim fails the heightened pleading standard of Rule 9(b). That contention also fails. Finally, SHN suggests that the complaint must be dismissed because Apex has failed to comply with a California statute aimed at deterring baseless professional negligence suits. That statute, however, merely establishes a rule of state procedure, which does not apply in this federal diversity action. Accordingly, SHN's motion must be denied.

## II. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal may be based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013). When evaluating a motion to dismiss the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-moving party. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To satisfy the rule, a plaintiff must allege the "who, what, where, when, and how" of the charged misconduct. *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997). In other words, "the circumstances constituting the alleged fraud must be specific enough to give defendants notice of

the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong." *Vess v. Ciba–Geigy Corp. U.S.A.*, 317 F.3d 1097, 1106 (9th Cir. 2003).

### III.   DISCUSSION

A.   Duty of Care

SHN claims that it cannot be held liable for the torts alleged in this action because it owed Apex no duty of care. Both parties assume that one test—specifically, the six-factor framework first articulated in *Biakanja v. Irving*, 49 Cal.2d 647, 650 (1958)—governs whether each of Apex's claims may proceed. Under California law, however, negligent misrepresentation "is a separate and distinct tort" from simple negligence and requires a unique duty of care analysis. *Bily v. Arthur Young & Co.*, 3 Cal.4th 370, 407-413 (1992). Even if a defendant does not, as a matter of law, owe a duty of care sufficient to support a professional negligence claim, that defendant may nevertheless be liable to the same plaintiff for negligent misrepresentation. *Id.* at 413 (holding that auditors may be liable for negligent misrepresentations made to investors but owe no duty of care to same individuals for "mere negligence").[3] The viability of each of Apex's claims is considered in light of this distinction.

1.   Breach of Professional Duty

The first question is whether SHN owed Apex a duty of care such that it may be held liable for professional negligence. "The threshold element of a cause of action for negligence is the existence of a duty to use due care toward an interest of another that enjoys legal protection against unintentional invasion." *Bily*, 3 Cal.4th at 397. "Recognition of a duty to manage business affairs so as to prevent purely economic loss to third parties in their financial transactions is the exception, not the rule, in negligence law." *Quelimaline Co. v. Stewart Title Guaranty Co.*,

---

[3] The dissent in *Bily* found it "anomalous to hold that the class of persons to whom" a defendant owes a "duty varies depending on which legal theory has been pleaded." *Id.* at 418-19 (Kennard, J., dissenting). Whatever the strength of that critique, a federal court sitting in diversity must faithfully apply the now-settled California law established by the *Bily* majority opinion.

ORDER DENYING MOTION TO DISMISS
CASE NO. 15-cv-02501-RS
4

19 Cal.4th 26, 58 (1998).  Recent California jurisprudence, however, suggests a trend toward expansion of this exception.  *Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP*, 59 Cal.4th 568, 574 (2014) ("The declining significance of privity has found its way into construction law.").   In the end, the concept of duty is "only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection."  *Bily*, 3 Cal.4th at 397.

The relevant framework for this policy inquiry was first laid out in *Biakanja* and most recently affirmed in *Beacon*.  To determine whether a duty of care exists in the absence of privity in the context of a negligence claim seeking economic damages, California courts balance six factors:  (1) "the extent to which the transaction was intended to affect the plaintiff," (2) "the foreseeability of harm to him," (3) "the degree of certainty that the plaintiff suffered injury," (4) "the closeness of the connection between the defendant's conduct and the injury suffered," (5) "the moral blame attached to the defendant's conduct," and (6) "the policy of preventing future harm."  *Biakanja*, 49 Cal.2d at 650.   The California Supreme Court has since highlighted several additional considerations as probative to the inquiry.  *Bily*, 3 Cal.4th at 399-406; *Beacon*, 59 Cal.4th at 581.

A series of decisions have applied the *Biakanja* analysis in the context of construction disputes.  SHN focuses primarily on two opinions from the California court of appeal.  *Weseloh Family Ltd. Partnership v. K.L. Wessel Const. Co.*, 125 Cal.App.4th 152, 158-173 (2004) (engineers owed no duty of care to property owner and general contractor in connection with alleged negligent design which caused retaining walls to fail); *The Ratcliff Architects v. Vanir Const. Management, Inc.*, 88 Cal.App.4th 595, 604-607 (2001) (construction manager owed no duty of care to architect in connection with alleged mismanagement of school renovation project). For its part, Apex relies heavily on the California Supreme Court's recent opinion in *Beacon*.  59 Cal.4th at 585-86 (architects owed duty of care to homeowners who purchased properties with defects alleged to have resulted from negligent design).  While these decisions offer some guidance, no single one is dispositive of the question presented here.

SHN suggests that *Ratcliff* governs the outcome of this case. Yet, as SHN conceded at oral argument, *Ratcliff* did not establish any bright-line rule that participants in construction projects are categorically immune from tort liability to one another. 88 Cal.App.4th at 607 (refusing "to expand tort liability to include a duty of care from the construction manager to the project architect"); *see also Beacon*, 59 Cal.4th at 578 (application of *Biakanja* factors "necessarily depends on the circumstances of each case"). Moreover, there are a number of important distinctions between *Ratcliff* and this case. For example, the "most" significant consideration weighing against imposing a duty of care in *Ratcliff* was the existence of a good faith settlement executed between the construction manager and the project owner. *Id.* at 607. Through the operation of a state statute, the settlement barred claims by "any other joint tortfeasor," such as the architect, from being asserted against the construction manager. *Id.* (quoting Cal. Civ. Proc. Code § 877.6(c)). In declining to find a duty of care, the court of appeal stressed that permitting the architect's claims to go forward would have "subvert[ed] California's public policy of encouraging good faith settlement." *Id.* Those unique facts are not present here. Nor, unlike in *Ratcliff*, would recognizing a duty under the discrete circumstances of this case give rise to a "potential conflict of loyalty." *Id.* at 606. Any duty SHN may have owed to Apex—to conduct a reasonable investigation of site conditions or, more generally, to employ the standard of care expected of a professional engineer—would have been consistent with its obligations to its client, Eureka.[4] At bottom, *Ratcliff* simply is not controlling.

In fact, *Weseloh* is the most closely analogous authority, but it too remains meaningfully distinguishable on a number of bases. For example, in *Weseloh*, the court of appeal found it probative that the engineer's designs were primarily intended to benefit the subcontractor responsible for building the retaining walls and were not directed to the general contractor. 125

---

[4] Assuming Apex's allegations are true, SHN's negligent conduct has exposed Eureka to litigation costs and the potential of further liability to Apex. While SHN may have had a contractual duty to control project costs, that obligation did not require it to undertake the putatively careless conduct averred in the complaint.

ORDER DENYING MOTION TO DISMISS
CASE NO. 15-cv-02501-RS

6

Cal.App.4th at 167. Here, in contrast, there is no second level of separation between the project participants: Apex was clearly the intended beneficiary, along with Eureka, of SHN's specifications and advice. *C.f. Beacon*, 59 Cal.4th at 586-87 (distinguishing *Weseloh* on fact that engineers provided their services to subcontractor, not general contractor). In addition, *Weseloh* was decided on summary judgment and was predicated, in large part, on the substantive deficiency of the evidence marshaled by the plaintiff. 125 Cal.App.4th at 168 (holding plaintiffs "failed to produce evidence" demonstrating that design defects caused their damages). Again, at the 12(b)(6) stage, Apex's well-pled allegations must be accepted as true.

In the absence of directly controlling precedent, the *Biakanja* factors, as interpreted by *Bily* and *Beacon*, must be consulted anew. The first factor weighs in favor of imposing a duty of care. In the GBR, SHN undertook to define the key conditions affecting the cost and scope of the project for the purpose of establishing a baseline upon which bids would be based. The complaint further alleges that SHN doubled-down on its negligent work after drilling commenced, repeatedly giving Apex illogical directives. SHN's putatively negligent acts were clearly "intended to affect the plaintiff." *Biakanja*, 49 Cal.2d at 650.

California courts give "limited weight to the foreseeability factor." *Weseloh*, 125 Cal.App.4th at 167. Here, too, it adds little to the analysis. The third and fourth factors, however, counsel in favor of imposing a duty of care. Apex avers that SHN: (1) failed to describe key project contours accurately; (2) ordered Apex to take unreasonable actions that caused it to lose equipment and sustain unexpected costs; and (3) recommended that Eureka deny Apex's requests for change orders and easements. Based on those allegations, SHN had positive knowledge, by the time Apex was dropped from the project, that its actions were directly responsible for considerable losses. *Biakanja*, 49 Cal.2d at 650 (instructing courts to look to "the degree of certainty that the plaintiff suffered injury" and "the closeness of the connection between the defendant's conduct and the injury suffered").

While the fifth factor, "moral blame," is not of enormous significance under these circumstances, SHN's alleged conduct hints of bad faith. The complaint avers that SHN

unreasonably directed the drilling work, in the face of mounting evidence of adverse soil conditions, and then advised Eureka to reject Apex's change order requests, which were only made necessary by SHN's poor decisions. The sixth and final *Biakanja* factor, "preventing future harm," has negligible salience here. 49 Cal.2d at 650.

*Beacon* provides further guidance. As the court in that case observed, it is more appropriate to impose a duty of care under circumstances where there is "no spectre of vast numbers of suits and limitless financial exposure." *Beacon*, 59 Cal.4th at 584 (quoting *Bily*, 3 Cal.4th at 400). If SHN had a duty of care here, it was owed only to "a specific, foreseeable, and well-defined class." *Beacon*, 59 Cal.4th at 583-84. There is no prospect of unlimited liability to a nebulous group of future plaintiffs.

Another consideration deemed significant in *Bily* and *Beacon* was the availability of "private ordering options that would more efficiently protect" the rights of the injured party. *Id.* at 581. At this point in the analysis, SHN's argument gains some traction. "As a matter of economic and social policy, third parties should be encouraged to rely on their own prudence, diligence and contracting power, as well as other informational tools." *Ratcliff*, 88 Cal.App.4th at 605 (quoting *Bily*, 3 Cal.4th at 403). Apex is a sophisticated actor, presumably with considerable experience dealing with other commercial entities and protecting its interests through careful contracting. It is "unrealistic" to expect homeowners, who are "ill-equipped with experience or financial means," to protect themselves from potential design defects. *Beacon*, 59 Cal.4th at 585. Apex, however, must be held to a higher standard. As for remedial efficiency, it would certainly be more expedient if all three actors in this case had contract-based claims against one another which could be litigated in a single forum.

Apex responds that, unlike parties to a typical commercial contract, bidders on Eureka's public works project had little ability to investigate the key assumptions found in the GBR and other pre-bid documents. Eureka gave contractors one month to prepare bids; according to Apex, this did not leave sufficient time for an independent investigation of soil conditions. Instead, all interested parties expected that the bidders would rely on SHN's specifications. While relevant,

these facts do not extinguish Apex's responsibility for failing to protect itself adequately through private ordering. They do, however, erode the suggestion that this consideration alone should outweigh the other factors discussed throughout this order.

The core theory of SHN's motion is that Apex has not followed "the correct procedure" here. SHN is adamant that its only liability should be to Eureka, which can always bring a contractual indemnity claim against SHN if Apex prevails in arbitration.[5] While that procedural progression would certainly be appropriate, it is not demanded by California law. *See Beacon,* 59 Cal.4th at 585 (rejecting argument that because "plaintiff may pursue its design defect claims against the developer, and the developer may in turn seek redress from" architects, no tort remedy should be available). Apart from the duty of care threshold, SHN has identified no legal rule precluding Apex from pursuing all remedies available to it, in contract and in tort. In the same vein, SHN suggests that, by bringing this action, Apex has impermissibly sought to "leapfrog" its contract with Eureka, which governs whether Apex is entitled to recover unforeseen costs incurred during the project. But SHN is not a party to that instrument; it does not—and, presumably, cannot—assert any contract-based defense.

California courts have repeatedly found construction design professionals potentially liable to third party consumers with whom they had no direct relationship. *Beacon,* 59 Cal.4th at 585 (design architects, who did not make final decisions on construction, had duty of care to later purchasers of homes; collecting similar cases holding architects and engineers liable to consumers). SHN asks this court to decide that, conversely, an engineer cannot owe any duty of care to a contractor, despite the fact that the parties interacted closely for months. It could be argued that if commercial entities are permitted to bring negligence actions against one another, contract law, which is better formulated to address business disputes, will be undermined. That

---

[5] In connection with this argument, SHN requests judicial notice of the complaint Eureka filed against Apex in arbitration. While notice of the existence of the complaint may be appropriate, it would be improper to credit any allegations of fact contained therein. *See, e.g., Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001).

ORDER DENYING MOTION TO DISMISS
CASE NO. 15-cv-02501-RS
9

potential critique, however, is purely hypothetical; it does not emerge from the relevant authorities. Whatever tension results from the recognition of a duty of care in this case, it is a tension inherent at the intersection of complex business relationships and California law permitting recovery in tort for purely economic harms.[6] On balance, the aggregate weight of the relevant factors and authorities dictates that SHN owed Apex a duty of care. Accordingly, SHN's motion to dismiss the breach of professional duty claim is denied.

### 2. Negligent Misrepresentation

The next question is whether SHN owed Apex a duty of care under a negligent misrepresentation theory. As discussed, under California law, a defendant's general duty to refrain from negligent conduct is not coterminous with the more specific duty to avoid making negligent misrepresentations. In *Bily*, the California Supreme Court expressly adopted section 552(2) of the Restatement (Second) of Torts as the test for identifying "the category of plaintiffs who may recover"—i.e., those plaintiffs to whom a defendant owes a duty of care—under a negligent misrepresentation theory, "provided all other elements are met." 3 Cal.4th at 414. Pursuant to the Restatement approach, to state a claim for negligent misrepresentation, a plaintiff must be a member of "a specific class of persons" involved in a transaction that the defendant "supplier of information intends the information to influence." *Id.* at 409. This is "*an objective standard* that looks to the specific circumstances (e.g., supplier-client engagement and the supplier's communications with the third party) to ascertain whether a supplier has undertaken to inform and guide a third party with respect to *an identified transaction or type of transaction.*" *Id.* at 410 (emphasis in original). Liability is "confined to cases in which the supplier *manifests* an intent to supply the information for the *sort of use* in which the plaintiff's loss occurs." *Id.* at 409

---

[6] It is worth noting that several state supreme courts in other jurisdictions have found that a duty of care may extend from architects and engineers to contractors. *Eastern Steel Constructors, Inc. v. City of Salem*, 549 S.E.2d 266, 275 (W.Va. 2001); *Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 463 S.E.2d 85, 89 (S.C. 1995); *Donnelly Const. Co. v. Oberg/Hunt/Gilleland,* 677 P.2d 1292, 1295-96 (Ariz. 1984), *rejected on other grounds by Gipson v. Kasey*, 150 P.3d 228, 231 (Ariz. 2007); *A.R. Moyer, Inc. v. Graham*, 285 So.2d 397, 403 (Fla. 1973).

(emphasis in original).

While the Restatement approach slightly resembles the *Biakanja* framework, it is a distinct analysis. The *Biakanja* test contemplates that a duty may be triggered by any species of negligent conduct. Section 552, in contrast, only permits liability to be imposed upon a defendant who supplies information with the intent to influence a defined and limited group of prospective plaintiffs. The difference between the two duties was recognized in *Weseloh*, the 2004 opinion holding that an engineer had no duty of care to a contractor in the context of a simple negligence claim. 125 Cal.App.4th at 172-73. Overlooked by the parties is the *Weseloh* court's observation that while the contractor's negligence claim was unsustainable, it "might have had" a negligent misrepresentation claim under *Bily*. *Id.* at 173. As the court further recognized, in *Bily* "the California Supreme Court specifically contemplated the availability of negligent misrepresentation claims to cases involving information provided by engineers." *Id.* at 174. It bears repeating: section 552, not *Biakanja*, governs the viability of Apex's negligent misrepresentation claim. *Bily*, 3 Cal.4th at 414; *accord Soderberg v. McKinney*, 44 Cal.App.4th 1760, 1766-1769 (1996) (applying section 552 approach, not *Biakanja* factors, to analyze whether property appraiser might owe duty of care to investors under negligent misrepresentation theory).

Turning to the Restatement test, the allegations in the complaint place Apex firmly within "the category of plaintiffs who may recover" from SHN for negligent misrepresentation.[7] *Bily*, 3 Cal.4th at 414. The touchstones of the section 552 analysis are all present here. According to the GBR, SHN undertook to furnish contractors with "a clear explanation" of relevant project site conditions "so that key geotechnical constraints and requirements" impacting "bid preparation and construction" would be "well-defined." Evidently, SHN intended to influence the substance of bids. *Id.* at 409. Further, SHN supplied its information to a closed universe of third parties: those contractors interested in bidding on the project. *Id.* (duty of care owed only to "limited class of

---

[7] A separate question is whether the negligent misrepresentation claim has been adequately pleaded. That question is answered in the affirmative below.

plaintiffs to whom the supplier itself has directed its activity"). Finally, SHN supplied information for the "sort of use"—the preparation of a bid relying on the conditions described in the GBR and other documents—from which Apex's alleged loss arose. *Id.*

A closely analogous case confirms the foregoing analysis. *M. Miller Co. v. Dames & Moore*, 198 Cal.App.2d 305 (1961). The plaintiff in *M. Miller* was a contractor which based its bid for a municipal sewage construction project on a soil report prepared by a defendant engineering firm. *Id.* at 307. The soil report was intended "to provide information for prospective bidders." *Id.* The contractor alleged that the report "failed to disclose certain unstable material underlying the construction site," causing it to submit an unfeasibly low bid. *Id.* The court of appeal reversed the trial court's grant of summary judgment, finding a triable issue of fact as to whether the engineer owed the contractor a duty of care. *Id.* at 308-309. In *Bily*, the California Supreme Court observed that *M. Miller* is "generally consistent" with the Restatement approach to negligent misrepresentation liability. 3 Cal.4th at 412, n.20.

Although timeworn, *M. Miller* remains good law.[8] It provides further confirmation that SHN may be subject to liability for negligent misrepresentations made to Apex under the circumstances present here, "provided all other elements are met." *Bily*, 3 Cal.4th. at 414. The prong of SHN's motion seeking to dismiss Apex's negligent misrepresentation claim for lack of a legally cognizable duty of care is therefore denied.

3.   Tort of Another

SHN contends that Apex's third claim, for "tort of another," must fail because an essential element of that claim is a "clear violation of a traditional tort duty." *Mega RV Corp. v. HWH Corp.*, 225 Cal.App.4th 1318, 1339 (2014). This argument, also known as the "where's the tort?"

---

[8] *M. Miller* has been criticized for its suggestion that the duty of care analysis should be reserved for the trier of fact. *Fru-Con Const. Corp. v. Sacramento Mun. Utility Dist.*, No. S-05-583-LKK, 2005 WL 1865499, at *2 (E.D. Cal. Aug. 3, 2005). Regardless of that possible misconception, *M. Miller* correctly deployed a version of the negligent misrepresentation analysis later adopted by the California Supreme Court, coming to the conclusion that a duty might lie under circumstances almost identical to those found in this case. If the present dispute came before a California court, *Bily* and *M. Miller* would compel the conclusion reached in this order.

1    defense, *Behniwal v. Mix*, 133 Cal.App.4th 1027, 1043 (2005), is premised upon the notion that

2    Apex cannot state a claim against SHN for either breach of professional duty or negligent

3    misrepresentation.  For the reasons discussed throughout this order, those claims are sufficient to

4    withstand SHN's motion to dismiss.  Because viable torts remain, the "tort of another" claim also

5    endures.

6    B.    Rule 9(b)

7    Separately, SHN argues that Apex's negligent misrepresentation claim fails to comply with

8    the heightened pleading standards set forth in Federal Rule of Civil Procedure 9(b).  As the parties

9    point out, Ninth Circuit law is unsettled regarding whether California negligent misrepresentation

10   claims must satisfy Rule 9(b)'s requirements.  *Compare Quatela v. Stryker Corp.*, 820 F.Supp.2d

11   1045, 1049 (N.D. Cal. 2010) (negligent misrepresentation claim subject to Rule 9(b)

12   requirements) *with Howard v. First Horizon Home Loan Corp.*, 12-cv-05735-JST, 2013 WL

13   6174920, at *5 (N.D. Cal. Nov. 25, 2013) (noting that the Ninth Circuit "has not yet decided"

14   whether Rule 9(b) applies to negligent misrepresentation claims and holding it does not).  In this

15   case, the discussion is purely academic.  Regardless of whether Apex's averments are evaluated

16   under Rule 9(b) or the more lenient requirements of Rule (8)(a), they are sufficient to state a

17   claim.  The complaint sets forth with considerable specificity the "who, what, where, when, and

18   how" of SHN's alleged misrepresentations.  *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997).

19   SHN's arguments to the contrary are conclusory and unpersuasive.

20   C.    Certificate of Merit

21   Finally, SHN contends that Apex has failed to comply with a state statute aimed at

22   deterring baseless professional negligence suits.  Prior to bringing an action "arising out of"

23   alleged negligence on the part of a professional engineer such as SHN, California law requires

24   plaintiff's counsel to file a certificate attesting:  (1) that the attorney has consulted another

25   certified engineer, who has offered an opinion that the defendant "was negligent or was not

26   negligent in the performance of the applicable professional services"; and (2) that the attorney

27   "has concluded on the basis of this review and consultation that there is reasonable and

meritorious cause for the filing" of an action in state court. Cal. Civ. Proc. Code § 411.35(a), (b)(1). A defendant is authorized by statute to demur on the grounds that "[n]o certificate was filed as required by Section 411.35." Cal. Civ. Proc. Code § 430.10(h). Apex does not dispute that if it had brought this litigation in state court, its failure to file a certificate would be cause for demurrer. *See, e.g., Price v. Dames & Moore*, 92 Cal.App.4th 355, 357 (2001). It maintains, however, that the certificate requirement is procedural in nature and therefore inapplicable in this federal diversity case. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996) ("Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law.").

Where, as here, no Federal Rule or law touches on the relevant question, a federal court sitting in diversity must apply the "relatively unguided" *Erie* analysis to determine "whether the rules at issue are substantive or procedural." *In re County of Orange*, 784 F.3d 520, 527 (9th Cir. 2015) (internal citations and quotation marks omitted). "A substantive rule is one that creates rights or obligations, or is bound up with state-created rights and obligations in such a way that its application in the federal court is required." *Id.* (internal citations and quotation marks omitted). A procedural rule, in contrast, "defines a form and mode of enforcing the substantive right or obligation." *Id.* (internal citations and quotation marks omitted).

Because it can be difficult to determine whether a rule is substantive or procedural, courts look to *Erie's* "core policies" for further guidance. *Id.* at 528 (internal citation and quotation marks omitted). Those policies require a district court to consider whether application of the federal rule would "encourage forum-shopping between state and federal courts" or "lead to inequitable administration of the laws." *Id.* (internal citations and quotation marks omitted). *Erie's* twin goals must be considered through the lens of "outcome determination"—the question is whether application of the state rule would "have so important an effect upon the fortunes of one or both of the litigants that failure to apply it would unfairly discriminate against citizens of the forum state, or be likely to cause a plaintiff to choose the federal court." *Snead v. Metropolitan Property & Cas. Ins. Co.*, 237 F.3d 1080, 1090-91 (9th Cir. 2001) (quoting

*Gasperini*, 518 U.S. at 428).

In support of its contention that the certificate requirement is procedural, Apex points to a 2007 order of another court in this district. *Rafael Town Center Investors v. Weitz Company*, C-06-6633-SI, 2007 WL 1577886, at *3-4 (N.D. Cal. May 31, 2007). In *Rafael*, the court was asked to decide the precise question presented in this case: is the certificate requirement found at California Code of Civil Procedure § 411.35 substantive or procedural? *Id.* at *3. Analyzing *Erie's* twin policies, the court concluded that the rule is procedural because it "does not contain any substantive elements of a professional negligence claim, nor does it limit recovery in any way." *Id.* at *4. The court also noted the similarity between the certificate requirement and "state procedures for obtaining court approval prior to seeking punitive damages, which courts have found to be procedural and not substantive." *Id.*

SHN counters with a series of cases from other jurisdictions,[9] most notably a Third Circuit opinion addressing a statute akin to the California law at issue here. In *Chamberlain v. Giampapa*, the court of appeals held that a New Jersey law requiring an "affidavit of merit" to be filed in medical malpractice actions "must be applied by federal courts sitting in diversity." 210 F.3d 154, 157 (3d Cir. 2000). Similar to California's statutory scheme governing professional negligence claims, New Jersey law explicitly provides that a failure to file the affidavit is grounds for dismissal. *Id.* at 158 (citing N.J. Stat. Ann. § 2A:53A–29). "Applying traditional *Erie* principles," the Third Circuit reasoned that by "requiring dismissal for failure to adhere to the statute, the New Jersey legislature clearly intended to influence substantive outcomes." *Id.* at 161. The court also concluded that the federal courts' failure to apply the affidavit requirement would disturb *Erie's* twin policy goals, allowing plaintiffs the "opportunity for a 'fishing expedition'" and pressuring defendants to settle meritless cases "rather than endure extensive discovery." *Id.;*

---

[9] SHN also relies on a district court order from within the Ninth Circuit, but that decision has little bearing on the analysis here. *Mistriel v. County of Kern*, 03–cv–06922–AWI–SKO, 2012 WL 2089804, at *3 (E.D. Cal. Jun. 8, 2012) (holding *pro se* plaintiff is not excused from filing certificate of merit in action involving claims of childhood sexual abuse; conducting no *Erie* analysis).

*see also Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258, 264-265 (3d Cir. 2011) (relying on *Chamberlain* to hold that Pennsylvania certificate of merit statute is substantive law).

The Third Circuit's reasoning was cogent as applied to the statutes at issue in *Chamberlain* and *Liggon-Redding*. California's section 411.35, however, is an odd duck. On one hand, the law has a weighty aim: "to protect architects and engineers from frivolous malpractice lawsuits." *Guinn v. Dotson*, 23 Cal.App.4th 262, 270 (1994). Consistent with this goal, noncompliance with the statute's requirements is grounds for demurrer. Cal. Civ. Proc. Code § 430.10(h).

Yet other facets of the statute indicate it is nothing more than a procedural hurdle. First, in lieu of obtaining a professional's opinion on the merits of a claim, a plaintiff can simply file a certificate stating that it has "made three separate good faith attempts with three separate [professionals] to obtain this consultation and none of those contacted would agree to the consultation." *Id.* at § 411.35(b)(3). This escape clause suggests that the certificate requirement is more in the nature of a formality. It is also notable that while a plaintiff's failure to satisfy the New Jersey affidavit requirement at issue in *Chamberlain* is grounds for dismissal with prejudice, California courts grant plaintiffs generous leave to amend to cure noncompliance with the certificate provision. *Compare Ferreira v. Rancocas Orthopedic Assoc.*, 836 A.2d 779, 780 (N.J. 2003) *with Prices v. Dames & Moore*, 92 Cal.App.4th 355, 361 (2001). Because its requirements may be surmounted through amendment, the California rule is not truly "outcome determinative." As *Rafael* correctly determined, section 411.35 is a rule of procedure, not substance. 2007 WL 1577886, at *3-4. Accordingly, its requirements do not apply in this diversity case.

## V. CONCLUSION

The motion to dismiss is denied. Defendant shall file an answer to the complaint within 20 days from the date of this order.

**IT IS SO ORDERED**.

Dated: August 11, 2015

_____
RICHARD SEEBORG
United States District Judge